**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| ALLIANCE TANK SERVICE, LLC, | |
| Third-Party Plaintiff, | |
| v. | CAUSE NO.: 2:14-CV-302-TLS |
| GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, | |
| Third-Party Defendant. | |

**OPINION AND ORDER**

This matter is before the Court on a Motion for Summary Judgment [ECF No. 61], filed by Third-Party Defendant Great American Insurance Company of New York ("Great American" or "GAIC"), a Motion for Summary Judgment [ECF No. 62], filed by Third-Party Plaintiff Alliance Tank Service, LLC ("Alliance"), and a Motion to Strike or Exclude Certain Opinions of Dr. William Warfel [ECF No. 67], filed by Great American. The motions are fully briefed and ripe for ruling. For the reasons set forth below, the Court denies the parties' motions for summary judgment and denies the motion to strike. Alliance's claims for breach of contract and bad faith remain pending for trial.

**MOTION TO STRIKE**

Great American asks the Court to strike or exclude certain opinions of Alliance's insurance expert, Dr. William Warfel. Great American argues that three portions of Dr. Warfel's expert deposition should be excluded: (1) his opinions offering improper legal conclusions; (2) his opinions on topics outside the scope of his expertise including the effect of OSHA regulations; and (3) his opinions regarding bad faith because they were disclosed late and offer legal conclusions outside his expertise. Finding that none of these grounds warrant striking Dr.

Warfel's expert opinions at the summary judgment stage, the Court denies Great American's Motion to Strike.

To start, Great American claims that some of Dr. Warfel's opinions are improper legal conclusions or are on topics outside his field of expertise. Neither Alliance nor the Court relies on the specific statements identified by Great American in addressing summary judgment. Therefore, the Court will not grant Great American's motion to strike on these grounds. *See, e.g.*, *Vaught v. Quality Corr. Care, LLC*, No. 1:15-CV-346, 2018 WL 1900153, at *2 (N.D. Ind. Apr. 19, 2018) ("Because the Court is able to distinguish which exhibits, affidavits, statements, and commentary may properly be considered when deciding whether summary judgment is appropriate, the Court declines to strike these statements from the Plaintiff's Memorandum.").

Next, Great American requests that the Court strike Dr. Warfel's opinions regarding Great American's bad faith for being disclosed late. Expert witnesses must prepare and sign a written report containing a complete statement of all opinions to be expressed. Fed. R. Civ. P. 26(a)(2)(B). Any additions or changes to the report necessary for the complete disclosure of the expert opinion must take place before the deadline for pretrial disclosures under Rule 26(a)(3). Fed. R. Civ. P. 26(e)(2). However, the duty to supplement cannot be used to disclose an entirely new expert opinion. *Vill. of Sauk Vill. v. Roadway Express, Inc.*, No. 15-CV-9183, 2017 WL 378424, at *2 (N.D. Ill. Jan. 25, 2017). If a party does not timely file the report, the court may exclude the expert from testifying at trial on the matters the party was required to disclose. Fed. R. Civ. P. 37(c)(1); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000). "The sanction of exclusion is 'automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.'" *NutraSweet*, 227 F.3d at 785–86 (quoting *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)). Four factors guide

a court's analysis of whether to exclude the testimony: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfullness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Great American argues that Dr. Warfel's opinions regarding the bad faith claims were not disclosed in his October 7, 2016 expert report but were raised for the first time in his depositions conducted in May and June 2017. However, the Court is convinced there was no prejudice resulting from the late disclosure. Great American was able to depose Dr. Warfel about his bad faith opinions, and the disclosures were made before the close of discovery on June 30, 2017. *See* ECF No. 58. The only prejudice Great American has identified is that it was unable "to explore the factual underpinnings for Dr. Warfel's bad faith opinions with Mr. Reece," Alliance's Rule 30(b)(6) witness, during his deposition. Mot. to Strike 13, ECF No. 67. This argument is tenuous at best given Great American's opportunity to question Mr. Reece extensively about the underlying facts of the case and his views of any alleged bad faith during his deposition in April 2017. Moreover, Great American does not identify any specific factual underpinnings of Dr. Wafel's bad faith opinions that it did not have a chance to explore with Mr. Reece. Because any late disclosure of Dr. Warfel's opinion on bad faith was harmless, the Court will not exclude his opinions on this ground. !

Great American also argues that Dr. Warfel's bad faith opinions are improper legal conclusions and that he is not qualified to express an opinion on bad faith. As noted, the Court can identify improper statements like an improper legal conclusion, and it will consider the objections to Dr. Warfel's bad faith opinions to the extent they arise in the summary judgment analysis. Regarding Great American's claim that Dr. Warfel is not qualified to render an opinion

3

on bad faith, the Court finds that Dr. Warfel has decades of experience teaching topics related to insurance, including bad faith, and he has assisted in evaluating claims of bad faith for both insurers and insureds. *See* Warfel CV 1–8, ECF No. 71-1; Warfel Dep. 16:11–17:21, ECF No. 71-2. He has also extensively researched and published on the topic of insurance, including bad faith. *See* Warfel CV 8–13. Although Dr. Warfel does not have hands-on experience in the industry, that does not require his opinion to be excluded. *See DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 719 (7th Cir. 1998); *see also Smith v. Nexus RVs, LLC*, 472 F. Supp. 3d 470, 476 (N.D. Ind. 2020) (explaining that "[k]nowledge can be developed in myriad ways," including through a professional degree or hands-on experience). Thus, for purposes of summary judgment, the Court finds that Dr. Warfel is qualified to provide an opinion on bad faith.

It may be that some of the issues raised in Great American's Motion to Strike will need to be addressed for trial purposes; however, at this stage of the case, the Court denies Great American's Motion to Strike. *See Fulton v. Dulin*, No. 1:16-CV-10, 2018 WL 2432740, at *8 (N.D. Ind. May 29, 2018) ("This would seemingly be an issue ripe for discussion and presented thoughtfully in a Motion in Limine prior to trial. In the meantime, the Plaintiff's Motion to Strike is DENIED in its entirety.").

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citation omitted). When the movant seeks summary judgment on a claim on which it bears the burden of proof at trial, the

movant "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). Alternatively, when the movant seeks summary judgment on a claim for which the non-movant bears the burden of proof at trial, the movant may demonstrate that it is entitled to judgment as a matter of law by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1015–16 (7th Cir. 2016) (citation omitted). At the end of the day, a court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## FACTUAL BACKGROUND

### A.    Alliance's Crane Rental

In October 2013, Alliance rented a Mantis Model 6010LP telescoping-boom crane from Howell Tractor and Equipment, LLC ("Howell"). 2d Am. Third-Party Compl. 4, ¶ 9, ECF No. 45. Alliance planned to use this crane for its business, which involved building above-ground storage tanks. Reece Dep. 7:3–25, ECF No 75-10. Under the Equipment Rental Agreement, Alliance agreed to "make[] no alterations, additions, modifications or improvements of or to" the crane without Howell's written consent. GAIC Ex. C, at 8, ¶ 7(b), ECF No. 64-3. Alliance would

bear responsibility for the full cost of repairs and maintenance, and "for the full replacement cost of the equipment" in the event it is lost or destroyed. *Id.*

In November 2013, Alliance was working on a project site in Michigan when the crane became stuck in some mud. 2d Am. Third-Party Compl. 3, ¶¶ 9–10. The crane's boom was bent during Alliance's efforts to free the crane from the mud. *Id.* at ¶ 10. After the incident, Howell had the crane transported back to its facility. Hammond Dep. 23:10–16, ECF No. 62-3.

**B.    Howell's Assessment of the Damage**

Now that Howell was in possession of the damaged crane, it reached out to Tadano Mantis Corporation ("Mantis"), the crane's manufacturer and a company Howell had worked with for over a decade. *See id.* at 40:20–41:11; Ellis Dep. 74:4–18, ECF No. 64-4. Howell wanted to determine whether Mantis had "allowable boom deflection criteria." Hammond Dep. 40:20–41:11. Stephen Atherton, a Mantis customer support technician, responded that Mantis had a maximum allowable deflection of 1/8" for a boom crane. Atherton Dep. 7:10–16, 9:3–11:25, ECF No. 75-5. Howell then disassembled the crane and one of its employees, Stan Balitewicz, measured the boom sections for deflections. Balitewicz Dep. 38:7–39:1, ECF No. 62-6. Balitewicz identified the following deflections:

- Main Section:
  - Maximum Camber – 7/16"
  - Maximum Sweep – N/A
- Middle (2nd) section:
  - Maximum Camber – 5/16"
  - Maximum Sweep – 3/16"
- Tip (3rd) section:
  - Maximum Camber – 1/4"
  - Maximum Sweep – 1/4"

*See id.* at 38:22–40:19; Lamb Dep. 20:15–21:3, ECF No. 62-5; GAIC Ex. M, ECF No. 64-13; Bond Report 3, ECF No. 62-7.

On January 13, 2014, Howell reached out to Mantis again, this time providing the deflection measurements. Hammond Dep. 50:20–51:16; *see* Hammond Dep Ex. 20, ECF No. 62-3. James Lamb, the general manager of customer support at Mantis, was in charge of reviewing boom measurements. Lamb Dep. 6:22–7:11. He explained in his deposition that he would compare deflection measurements against Mantis' deflection criteria, which had been issued in 2007 and were in effect at the time of the incident. *Id.* at 10:18–13:17. The Deflection criteria provided:

Boom tube damage / defects:

- ≤ 1/8" deep "ponding" or ≤ 1/16" deep scratches / gouges of the base metal on tension and shear surfaces (top & side panels) ***not in the bearing pad areas***, typically do not require remediation. Similarly sized defects in the bottom (compression) surface or bearing pad areas should be carefully quantified, digitally photographed, and referred to the manufacturer for possible repair procedures.
- > 1/8" deep defects should be carefully quantified, digitally photographed, and referred to the manufacturer for possible repair procedures.
- > 1/16" deep scratches / gouges should be carefully quantified, digitally photographed, and referred to the manufacturer for possible repair procedures.

GAIC Ex. 2, ECF No. 76-3.[1] When a defect is greater than 1/8", it is referred to Mantis and, "depending upon the location, [Mantis] makes a determination whether it is acceptable or not." Lamb Dep. 11:20–25. That decision seems to be based partially on the manufacturer's engineering judgment. Ver Halen Dep. 103:22–104:12, ECF No. 76-4.

On February 12, 2014, Lamb informed Howell by email that the defects exceeded Mantis' criteria and that Mantis believed that the tubes should be replaced. GAIC Ex. N, at 2, ECF No. 64-14. Lamb further stated that "[i]t is of course the prerogative of the crane owner to

---

[1] Great American maintains that, while it was told of a 1/8" deflection criteria, it was never provided with the specific written criteria until discovery in this lawsuit. GAIC Br. in Supp. 8, ¶ 24, ECF No. 69; *see* Kozlove Dep. 70:3–9, ECF No. 62-2.

pursue other independent courses of action but they should obtain written assurances from those attempting to straighten or otherwise 'repair' these components." *Id.* Five days later, Mantis provided a formal letter stating:

> The deformations exceed the limits of acceptance criteria published by [Mantis], and as the Manufacturer we recommend the boom should be replaced. Under no circumstances should repair / straightening of the damaged boom tube sections be attempted and if attempted [Mantis] will accept no responsibility for the continued operation or structural competence of this equipment.

Hammond Dep. Ex. 25, ECF No. 62-3. Based on Mantis' view that the crane boom should be replaced, Howell sought to recover the costs of replacement from Alliance. 2d Am. Third-Party Compl. 4–5, ¶ 14.

**C.      Great American's Assessment of the Damage**

Following the incident, Alliance also notified its insurer, Great American. 2d Am. Third-Party Compl. 2–4, ¶¶ 5, 11. Great American had issued Insurance Policy No. IMP 196-70-72-02 ("Policy") to Alliance, which covered, among other things, "loss or damage to contractor's equipment and tools, that you lease or rent from others . . . while such property is in your care, custody or control." Policy 4, 37, ECF No. 62-1. When a covered liability arose, the Loss Payment provision of the Policy provided that Great American would pay for the loss within 30 days after receiving "the sworn proof of loss" if Alliance has "complied with all the terms of this Coverage Part" and if either Great American and Alliance agreed "on the amount of the loss" or there was "an appraisal award." *Id.* at 27, ¶ E.5. Under the Valuation provision of the "Equipment Leased or Rented from Others Coverage Endorsement" to the Policy, Great American would "pay the amount for which you are liable according to the terms of the lease or rental agreement, not to exceed the lesser of:"

> 1.      the replacement cost of a substantially identical new item (without deduction for depreciation) at the time of loss or damage; or

2.      the amount necessary to repair the equipment (without deduction for depreciation); or

3.      the amount actually spent that is necessary to repair or replace the lost or damaged property; or

4.      the applicable Limit of Insurance shown above[.]

*Id.* at 38. Finally, the Policy excludes certain losses, including those "caused by or resulting from . . . [d]elay, loss of use, loss of market or any other consequential loss." *Id.* at 32, ¶ 2(a).

Once Alliance told Great American of the claim for the damaged boom, Great American began appraising the damage. 2d Am. Third-Party Compl. 4, ¶¶ 11, 13. On December 5, 2013, Great American retained Ben Glaser, a heavy equipment appraiser with Crawford & Company ("Crawford"), to assess the damage to the boom sections. Glaser Aff. 1–2, ¶¶ 3, 5, ECF No. 64-18. Glaser travelled to Howell's facility twice to inspect the crane's boom sections; however, he did not take any independent deflection measurements. *Id.* at 2, ¶¶ 7, 9; Kozlow Dep. 69:8–10, ECF No. 62-2. Glaser photographed the boom sections and sent those pictures and Howell's measurements to Midwest Certified Boom Repair ("Midwest") to get its assessment of the damage. Glaser Aff. 2–3, ¶¶ 11–12. Midwest said that it would be able to repair the boom and that its repair would pass an OSHA inspection, providing a "Guarantee Certificate" to that effect. *Id.* at 3, ¶¶ 13–14; *see* Glaser Aff. Ex. D, ECF No. 64-18. Furthermore, Midwest told Glaser that it would accept liability for the boom if it did the repair. Glaser Aff. 3, ¶ 16; *see* GAIC Ex. W, at 2–3, ECF No. 64-23. Based on Crawford's findings and recommendation, Great American was aware that the boom sections could be repaired. Kozlove Dep. 50:7–51:11.

On March 26, 2014, Great American sought an opinion from WHECO Corporation, a crane repair shop. *Id.* at 78:11–79:20, 82:22–83:1. WHECO told Great American that it could also repair the boom, and that its repair could pass OSHA inspection. GAIC Ex. X, at 2, ECF No. 64-24. Furthermore, in early April 2014, Great American retained Tony Bond, an engineer at

Haag Engineering, to inspect the boom and determine whether it could be repaired. Kozlove
Dep. 57:4–16, 95:21–96:23. Bond felt that the boom sections could be repaired. *Id.* at 102:1–
103:4. However, Bond also took measurements of the boom sections, which reflected greater
deflections than Howell's measurements. *See id.* at 103:10–105:22. Bond described to Great
American that the deviations were gradual and that there were no kinks or bends in the boom
sections. Bond Aff. 2–3, ¶ 12, ECF No. 76-7.

### D.    Dispute Over Repair Versus Replace

On February 5, 2014, Glaser asked Howell whether it would agree to have the boom
sections repaired, stating that he would like "to have the boom sections straightened and
refinished." GAIC Ex. W, at 6. Howell refused the offer, asserting that it could not accept repair
under "current OSHA regulations" due to Mantis' statements that it should be replaced. *Id.* at 4–
5. On February 14, 2014, Glaser again asked whether Howell would agree to replacing the boom,
this time providing Midwest's assumption of liability for the repair. *Id.* at 2–3. Still, Howell
refused based on Mantis' recommendation and Howell's view that it could not have a crane in its
rental fleet that is not supported by the manufacturer. GAIC Ex. Y, ECF No. 64-25. Howell
further explained that if Great American refused to pay for replacement, it "will have no choice
but to replace the boom at [its] own expense and seek legal redress against Alliance." *Id.* at 2.

As for Alliance, it was of the view that the boom sections might be repaired, as opposed
to replaced. *See* Alliance Resp. to Req. for Admis. No. 5, ECF No. 64-11; GAIC Ex. AA, at 11,
20, ECF No. 64-27. However, Sammy Reece, Alliance's owner and Rule 30(b)(6) witness,
explained that Alliance was relying on the experts to determine whether repair or replacement
was the best option, and that it further relied on Great American to resolve the claim. Reece Dep.
85:13–87:8. Alliance also expressed concern to Great American about the continued rental

payments Alliance owed Howell and the potential litigation costs. *Id.* at 86:22–87:8; Kozlove Dep. 124:23–127:19.

Ultimately, on April 11, 2014, Great American sent a check to Howell for $48,298.78 despite the fact Howell requested $142,645.55 to resolve the dispute. *See* GAIC Ex. CC, ECF No. 64-29; GAIC Ex. BB, at 1, ECF No. 64-28. Great American offered $48,298.78 based on a repair estimate of $53,298.78, as prepared by Crawford and Midwest, less the $5,000 Alliance owed as a deductible. Kozlove Dep. 87:11–22. Howell accepted the money but maintained that it was owed the full cost of replacement. *See* GAIC Ex. CC. Howell then filed this lawsuit against Alliance to recover the remaining replacement costs as well as additional rental payments and attorney's fees. 2d Am. Third-Party Compl. 5, ¶ 16.

On April 14, 2014, Alliance notified Great American that it hired a lawyer "due to the stress level and financial obligations from [the] claim not being handled in a timely manner." Kozlove Dep. Ex. 100, ECF No 75-3. In a letter, Alliance's attorney noted concerns about the amount of time it took to resolve the claim, issues with ongoing rental fees, and the risk of a lawsuit. Kozlove Dep. Ex. 101, ECF No. 75-3. The letter also stated that Alliance was considering "a breach of contract and bad faith claim against [Great American] for their delay in this matter." *Id.* On May 7, 2014, Great American told Alliance that a closing letter was forthcoming, that it would only pay the repair cost, and that it would not defend against any claims brought by Howell. Kozlove Dep. Ex. 102, ECF No. 75-3. On May 13, 2014, Alliance's attorney asked that Great American reconsider its position. *See* Kozlove Dep. Ex. 103, ECF No. 75-3. Great American did not make any additional payment and issued a closing letter on June 19, 2014. *See* Kozlove Dep. Ex. 105, ECF No. 75-3. In July 2014, Alliance's insurance agent asked Great American's agent to reconsider its position on repair versus replacement. *See*

Kozlove Dep. Exs. 107, 108, ECF No. 75-3. Great American declined the request. *See* Kozlove Dep. Ex. 108, at 1.

## PROCEDURAL BACKGROUND

On August 28, 2014, Howell filed its Complaint [ECF No. 1] in this Court against Alliance, seeking to recover damages that resulted from the crane being damaged. On December 8, 2014, Alliance filed its Third-Party Complaint against Great American [ECF No. 9], seeking to recover damages for breaching their insurance contract. Alliance amended its complaint and added a bad faith claim against Great American. *See* Am. Third-Party Compl., ECF No. 15; 2d Am. Third-Party Compl., ECF No. 45.

On August 14, 2017, Great American, Alliance, and Howell all filed motions for summary judgment. ECF Nos. 61, 62, 65. Additionally, Howell filed a motion to bar many of Great American's expert witnesses [ECF No. 68], and Great American filed its motion to strike Alliance's expert witness, Dr. William Warfel [ECF No. 67].

On March 20, 2018, this Court granted Howell's motion for summary judgment on the liability issue, concluding Alliance was liable for the full cost of replacement, but the Court denied summary judgment on the damages issue. Mar. 20, 2018 Op. & Order 23–24, ECF No. 81. Because the damages issue would have to go to trial, the Court: (1) stayed Alliance's third-party claims until after trial; (2) denied Alliance's motion for summary judgment without prejudice and with leave to refile; (3) denied Great American's motion for summary judgment without prejudice and with leave to refile; and (4) denied Great American's motion to strike Dr. Warfel's opinion without prejudice and with leave to refile. *Id.* Following the Court's Opinion, Great American tendered an additional $89,346.77 to Howell and Alliance, which would cover

the remaining cost of replacement. *See* Aff. of Counsel 2, ¶ 7, ECF No. 104-1; Apr. 9, 2018 Letter, ECF No. 104-2.

On April 16, 2019, the parties filed a stipulation and motion for dismissal of the action between Howell and Alliance [ECF No. 103] based on the parties reaching a settlement. On April 25, 2019, Alliance and Great American filed a joint motion to reinstate their motions for summary judgment [ECF No. 105], which the Court granted. *See* ECF No. 108. The parties filed supplemental briefing on Great American's motion for summary judgment. ECF Nos. 104, 107.

Finally, on October 19, 2021, the Court held a telephonic status/ruling conference. ECF No. 119. The court gave a preliminary ruling denying the parties' motions for summary judgment and Great American's motion to strike, explaining that a final written decision would follow. *Id.* The Court informed the parties that their case would proceed to trial.

## ANALYSIS

Great American and Alliance both filed motions for summary judgment. Great American seeks summary judgment on Alliance's breach of contract claim and its bad faith claim. Alliance seeks summary judgment on the issue of whether Great American was entitled to rely on the Policy provision allowing it to repair, rather than replace, the damaged boom sections. Both parties' motions for summary judgment are denied, and the reasons for denial will be discussed in turn.

**A.      Great American's Motion for Summary Judgment—Breach of Contract**

Great American first seeks summary judgment on Alliance's breach of contract claim, which alleges that Great American breached the Policy by refusing to pay the amount owed to indemnify Alliance against Howell's claims and that Alliance suffered additional consequential damages as a result. *See* 2d Am. Third-Party Compl. 5–6, ¶¶ 17–19. Great American argues that

it paid the cost of replacement in a timely fashion once the Court determined Alliance owed Howell that amount in its March 20, 2018 Opinion. Alliance argues that the time of the breach was in 2014 when Great American refused to pay the replacement cost.

Under Indiana law, a breach of contract claim requires showing: "(1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007) (citing *Breeding v. Kye's, Inc.*, 831 N.E.2d 188, 191 (Ind. Ct. App. 2005)). In their briefing, the parties primarily dispute whether there was a "breach," which "is defined as the failure of one party to perform all of the obligations set forth in the governing contract." *Cincinnati Spec., Underwriters Ins. Co. v. DMH Holdings, LLC*, No. 3:11-CV-357, 2013 WL 683493, at *5 (N.D. Ind. Feb. 22, 2013) (citing *Breeding*, 831 N.E.3d at 191).

An insurance contract "is subject to the same rules of interpretation as are other contracts." *Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663, 666 (Ind. 2006) (quoting *USA Life One Ins. Co. of Ind. v. Nuckolls*, 682 N.E.2d 534, 537–38 (Ind. 1997)). The goal of contract interpretation "is to ascertain and enforce the parties' intent as manifested in the policy." *Peabody Energy Corp. v. Roark*, 973 N.E.2d 636, 640 (Ind. Ct. App. 2012). Typically, interpretation of an insurance contract is a legal question for the court that is particularly suited for summary judgment. *Secura Supreme Ins. Co. v. Johnson*, 51 N.E.3d 356, 359 (Ind. Ct. App. 2016). When the contract language is clear and unambiguous, it will be given its plain meaning. *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002). However, when a contract is ambiguous and "its interpretation requires extrinsic evidence, its construction is a matter for the factfinder." *Buskirk v. Buskirk*, 86 N.E.3d 217, 224 (Ind. Ct. App. 2017) (quoting *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010)); *see Secura Supreme*, 51 N.E.3d at 359 ("[I]f the

14

terms of a written contract are ambiguous, it is the responsibility of the jury to ascertain the facts necessary to construe the contract.").

Here, Great American relies on the Policy's Loss Payment provision to argue that it has not breached the insurance contract. The Loss Payment provision provides:

> We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if you have complied with all the terms of this Coverage Part and:
> a. we have reached agreement with you on the amount of the loss; or
> b. an appraisal award has been made.

Policy 27, ¶ E(5). Great American seems to argue that once this Court's March 20, 2018 Opinion was issued, it had 30 days to tender the remaining payment under the provision. However, Great American has not explained how the Opinion affects any of the provision's prerequisites to payment, which would then trigger the 30-day clock. The Opinion does not involve the sworn proof of loss or Alliance's compliance with the terms. The Opinion is not "an appraisal award" under the Policy. *See* Policy 26, ¶ B (describing the appraisal process, which involves the parties selecting separate appraisers and the possible use of an umpire). Nor can the Opinion be understood as an "agreement . . . on the amount of the loss." The Court did not determine the value of the crane or resolve issues about cost estimates for repairing/replacing the boom. And it does not appear that Alliance and Great American ever disputed the estimates that were provided for the cost of replacement. Instead, the Court resolved a liability dispute between Howell and Alliance as to whether repair or replacement was required under the Equipment Rental Agreement. Resolution of Alliance's liability to Howell would not, by itself, trigger the Loss Payment provision because the liability issue is distinct from a determination about the "amount of the loss." *Cf. Weidman v. Erie Ins. Grp.*, 745 N.E.2d 292, 297–98 (Ind. Ct. App. 2001) (explaining, in relation to the appraisal provision of a similar policy, that "the amount of the loss" is not the same as the parties' liability); *Travelers Prop. Cas. Co. of Am. v. Marion T, LLC*,

No. 1:07-cv-1384, 2010 WL 1936165, at *8 (S.D. Ind. May 12, 2010).[2] Thus, Great American's

argument that it complied with the Policy by paying the replacement cost within 30 days of the

Court's Opinion does not warrant judgment in its favor.

Great American has offered no other reason to conclude that it fulfilled its obligations

under the Policy by paying the remaining replacement cost in April 2018. As for Alliance, it has

reasonably argued that the breach occurred in 2014 when Great American declined to pay the

full replacement cost and issued a closing letter. Despite being relatively clear, the Policy's terms

do not provide an answer for the parties' dispute. Specifically, the Policy does not seem to

account for Great American initially refusing payment via a closing letter only to make that

payment once the Court found Alliance liable to Howell years later. Because this ambiguity is

caused by the case's underlying facts, extrinsic evidence may be necessary to better understand

the parties' intent underlying the Policy and whether Great American's delayed payment would

have been consistent with the parties' understanding. *See Fresh Cut, Inc. v. Fazli*, 650 N.E.2d

1126, 1133 (Ind. 1995) ("Rules of contract construction and extrinsic evidence need to be

employed to determine and give effect to the parties' reasonable expectations."). Either way,

Great American has not carried its burden of negating an element of Alliance's breach of

---

[2] Although both *Weidman* and *Marion T* deal with appraisal awards, those cases are helpful for understanding whether Great American accurately describes how the Policy works. Under the Loss Payment provision, subparts (a) and (b) work in tandem to address the same issue—namely, to determine the amount of the loss. If the parties do not agree about the amount of loss, then appraisal is the alternative way for determining that amount. However, the appraisal process is not meant to address liability or coverage issues. *See Weidman*, 745 N.E.2d at 297–98; *Marion T*, 2010 WL 1936165, at *8; *see also Villas at Winding Ridge v. State Farm Fire & Cas. Ins. Co.*, No. 1:16-cv-3301, 2019 WL 1434220, at *8 (S.D. Ind. Mar. 29, 2019) (explaining how "appraisers are experts at determining how much damage a property has sustained but insurance adjusters, attorneys, and courts are better-suited to resolve the contract language, which determines how much of that loss is covered by the policy"). If the appraisal process does not address liability and coverage disputes, then it would make sense that an "agreement . . . on the amount of the loss" does not necessarily refer to an agreement on liability or coverage. Thus, after the Court's March 20, 2018 Opinion, Great American cannot claim to have agreed "on the amount of the loss" as it is understood in the Loss Payment provision. The Opinion simply determined Alliance's liability and would not necessarily trigger the 30-day clock.

contract claim. *See Hummel*, 817 F.3d at 1015–16. Therefore, summary judgment is not appropriate.

**B.      Great American's Motion for Summary Judgment—Bad Faith**

Great American next seeks summary judgment on Alliance's bad faith claim, which alleges that Great American made an unfounded refusal to pay or caused an unfounded delay in payment. *See* 2d Am. Third-Party Compl. 6–7, ¶¶ 20–27. Great American argues that it has not denied or delayed payment and that any dispute between the parties was in good faith considering it relied on various experts when deciding to pay the cost of repair in 2014.

In Indiana, it has long been the case that an insurer has an implied legal duty to "deal in good faith with its insured." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). While there is no exhaustive list of bad-faith actions, good faith includes refraining "from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement." *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005) (quoting *Hickman*, 622 N.E.2d at 519). Generally, bad faith requires a showing "of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Id.* at 977 (quoting *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)). In fact, even if an insurer ultimately breached the contract, "a good faith dispute about the amount of a valid claim or about whether the insured has a valid claim" does not constitute bad faith. *Hickman*, 622 N.E.2d at 520. "Similarly, the lack of diligent investigation alone is not sufficient to support" a bad faith claim. *Id.* But if an insurer "denies liability knowing there is no rational, principled basis for doing so," then it has breached its duty of good faith. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002) (citing *Hickman*, 622 N.E.2d at 520).

17

Here, Great American has not carried its burden at summary judgment. Although Great American has attempted to show a good faith dispute by describing its reliance on experts and Mr. Reece's statements, Alliance has responded with its own evidence that, when viewed in a favorable light, show that Great American's refusal to pay the replacement cost was unfounded. For example, Alliance has evidence showing that Great American and its experts were fully aware that Howell was relying on Mantis' recommendation that the boom sections should be replaced. Howell's concerns about OSHA compliance and its ability to rent a crane not supported by the manufacturer were also raised to Great American and its experts. Moreover, Alliance appeared to tell Great American about the consequences of delaying or refusing to pay the replacement cost, including the ongoing rental fees of $10,500 per month and the risk of litigation. Even after Great American determined to pay only the repair costs, Alliance's attorney and insurance agent reiterated these concerns and asked Great American to reconsider its position. Great American's decision to discount the concerns of Howell, Mantis, and Alliance could be reasonably perceived as bad faith on behalf of Great American. This is particularly true considering, toward the end of their negotiations, Howell was agreeing to resolve the dispute for $142,645.55, which was well under the Policy's $800,000 limit. *See* Policy 37.

The Indiana Court of Appeals addressed similar circumstances in *Nelson v. Jimison*, where it reversed a trial court's grant of summary judgment on an insurance bad faith claim. 634 N.E.2d 509, 513 (Ind. Ct. App. 1994). Despite the defendant insurance company offering "reasonable explanations for disputing the claim and the long delay in the payment," the court concluded that the claim needed to be resolved by the jury. *Id.* It highlighted the fact that (1) the insurer conceded coverage and paid the claim five years later, (2) the plaintiff had two expert opinions saying it was unreasonable to dispute the value of the claim or delay payment, (3) the

18

insurer lost important documents, and (4) the plaintiff's attorney tried to convince the insurer of

the claim's value. *Id.* at 512–13. Similarly, Great American seems to understand—though it does

not admit—that it owes the full replacement cost under the Policy considering it paid the

remaining balance after years of litigation. Alliance asked Great American to reconsider its

decision, which Great American rejected. And finally, Alliance appears to have an insurance

expert willing to testify that Great American operated in bad faith based on various actions it

took in handling and resolving the insurance claim. *See* Warfel Dep. 131:3–133:18, ECF No. 64-

9.[3] As in *Jimison*, the bad faith claim will need to be resolved at trial in light of these disputed

facts. Therefore, summary judgment is not appropriate on this claim.

## C.     Alliance's Motion for Summary Judgment

In its Motion for Summary Judgment, Alliance seeks judgment in its favor "on the issue

of whether [Great American] was entitled to invoke the provision within the insurance policy

allowing it to repair, rather than replace, covered property." Alliance Mot. Summ. J. 1, ECF No.

62. Although the phrase, "entitled to invoke the provision," is a bit confusing in terms of the

relief Alliance seeks, it appears that Alliance wants a judgment that Great American was

---

[3] While Dr. Warfel's opinion that Great American operated in bad faith might be on the ultimate issue for
trial, the Court finds the basis for his opinion is helpful for assessing the bad faith claim at summary
judgment. *See Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012) (explaining how opinions that
embrace an ultimate issue are still required to be helpful to the trier of fact and should not merely tell the
trier of fact what result to reach (citing Fed. R. Evid. 704, 1972 advisory committee's note)); *see also* Fed.
R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). In the
portions of his deposition provided with the summary judgment briefing, Dr. Warfel testifies that Great
American's failure to issue a reservation of rights letter shortly after the claim arose was a reason for his
opinion that Great American acted in bad faith. *See* Warfel Dep. 131:3–133:18. Furthermore, other
portions of Dr. Warfel's deposition and his report—which were filed in connection to the motion to
strike—provide additional clarity as to how he reached his opinion on bad faith. *See* Fed. R. Civ. P.
56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the
record."). This includes his view that Great American did not give adequate consideration to Alliance's
interests in a variety of ways, *see* Warfel Dep. 95:23–99:8, ECF No. 67-1, and his opinion that Great
American unreasonably breached the contract in light of Mantis' recommendation, *see* Warfel Report 7,
ECF No. 67-2.

required to pay the full cost of replacement in 2014 when it issued its closing letter.[4] But, like Great American's Motion for Summary Judgment, that issue will need to be resolved by a jury.

As discussed, the Policy is not clear on whether Great American was obligated to pay the full replacement cost at the time it issued its closing letter or whether it could wait until after the Court determined Alliance's liability to Howell. Alliance's arguments in its motion for summary judgment regarding the Valuation provision and the OSHA regulations—which, granted, were made before Great American tendered the remaining cost of replacement after the Court's March 20, 2018 Opinion—do not address whether Great American could wait to make the payment until after Alliance's liability was determined. Because a reasonable jury could find that the Policy allowed Great American to hold off paying the full replacement cost, the Court denies Alliance's motion for summary judgment on this issue.

As a final note, in its response to Alliance's motion for summary judgment, Great American argues that Alliance cannot recover attorney's fees under its breach of contract claim. Alliance appropriately responds that attorney fees and litigation expenses arising from third-party litigation may be recovered under a breach of contract claim if "the defendant's breach of contract caused the plaintiff to engage in litigation with a third party to protect its interest and

---

[4] The phrase, "entitled to invoke the provision," is confusing because it does not explicitly tie this request to a claim or part of a claim in its complaint. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."). Great American recognized this issue and chose to operate under the assumption that Alliance's motion related to the breach of contract claim. *See* Great American Resp. 4 n.4, ECF No. 76. In its Reply, Alliance did not correct Great American's assumption or address the issue at all. Ultimately, whether Great American was "entitled to invoke" the repair provision seems relevant insofar as the Court is deciding whether Great American breached the Policy when it initially paid only to repair the crane in 2014. This understanding is consistent with Alliance's concluding statement in its Supplemental Response, which "requests that the Court deny [Great American's] Motion for Summary Judgment and grant Alliance's Motion for Summary Judgment, finding that [Great American] was required to pay the full cost to replace the boom sections when it tendered cost for repair and issued its closing letter." Alliance Supp. Resp. 10, ECF No. 107. Thus, it seems reasonable to view Alliance's motion as requesting judgment on the liability issue under the breach of contract claim, as well as Great American's Frist Affirmative Defense related to the Valuation provision.

such action would not have been necessary but for defendant's breach." *Masonic Temple Ass'n of Crawfordsville v. Ind. Farmers Mut. Ins. Co.*, 837 N.E.2d 1032, 1039 (Ind. Ct. App. 2005). However, because Alliance did not seek summary judgment on this issue of damages, the Court need not consider whether Alliance is entitled to them as a matter of law.

## CONCLUSION

Based on the foregoing, the Court hereby DENIES the Motion to Strike or Exclude Certain Opinions of Dr. William Warfel [ECF No. 67], DENIES Great American's Motion for Summary Judgment [ECF No. 61], and DENIES Alliance's Motion for Summary Judgment [ECF No. 62]. All claims remain pending for trial.

SO ORDERED on November 19, 2021.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT